1
2
3
4
5
6
7
8        **UNITED STATES DISTRICT COURT**
9        **CENTRAL DISTRICT OF CALIFORNIA**
10       **WESTERN DIVISION**
11

12  TONI SUSANN VARONE,                    )    No. CV 15-2988-PLA
                                           )
13                  Plaintiff,             )
                                           )
14             v.                          )    **MEMORANDUM OPINION AND ORDER**
                                           )
15  CAROLYN W. COLVIN, ACTING              )
    COMMISSIONER OF SOCIAL                 )
16  SECURITY ADMINISTRATION,               )
                                           )
17                  Defendant.             )
                                           )
18  _____ )

19                          **I.**

20                   **PROCEEDINGS**

21          Plaintiff filed this action on April 22, 2015, seeking review of the Commissioner's denial of

22  her application for Disability Insurance Benefits ("DIB").  The parties filed Consents to proceed

23  before the undersigned Magistrate Judge on May 20, 2015.  Pursuant to the Court's Order, the

24  parties filed a Joint Stipulation on February 19, 2016, that addresses their positions concerning

25  the disputed issues in the case.  The Court has taken the Joint Stipulation under submission

26  without oral argument.

27  /

28  /

## II.

## BACKGROUND

Plaintiff was born on July 26, 1980. [Administrative Record ("AR") at 27, 148.]  She has past relevant work experience as a private duty nurse, registered nurse, office nurse, nurse assistant, and in the hybrid position of cashier II and recreation aide.  [AR at 26-27, 63-64.]

On December 30, 2011, plaintiff protectively filed an application for a period of disability and DIB, alleging that she has been unable to work since January 8, 2009. [AR at 18, 146-54.]  After her application was denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR at 18, 115.]  A hearing was held on May 23, 2013, at which time plaintiff appeared represented by an attorney, and testified on her own behalf. [AR at 34-68.]  A vocational expert ("VE") also testified.  [AR at 62-67.]  On June 19, 2013, the ALJ issued a decision concluding that plaintiff was not under a disability from January 8, 2009, the alleged onset date, through June 19, 2013, the date of the decision.  [AR at 18-28.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 14.]  When the Appeals Council denied plaintiff's request for review on February 18, 2015 [AR at 5], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)

(same).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability

to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy.  Id.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

## B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 8, 2009, the alleged onset date.[1]  [AR at 20.]  At step two, the ALJ concluded that plaintiff has the severe impairments of thoracolumbar musculoligamentous strain; polyarthralgia; bipolar disorder; and polysubstance dependence.  [Id.]  At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing.  [Id.]  The ALJ further found that plaintiff retained the residual

---

[1]    The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through June 30, 2014.  [AR at 20.]

4

functional capacity ("RFC")[2] to perform medium work as defined in 20 C.F.R. § 404.1567(c),[3] as follows:

> [C]an frequently climb ladders, ropes and scaffolds. She should avoid concentrated exposure to temperature extremes, fumes, gases, dust and the like. In addition, she is limited to simple, routine, repetitive tasks with no public contact.

[AR at 22.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is unable to perform any of her past relevant work as a private duty nurse, registered nurse, office nurse, nurse assistant, or in the hybrid job of cashier II and recreation aide. [AR at 26-27, 64.] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "warehouse worker" (Dictionary of Occupational Titles ("DOT") No. 922.687-058), "packer" (DOT No. 920.587-018), and "small products assembler" (DOT No. 706.684-022). [AR at 28, 65-66.] Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of January 8, 2009, through June 19, 2013, the date of the decision. [AR at 28.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he: (1) failed to present a hypothetical to the VE that accurately reflected plaintiff's exertional and non-exertional limitations; (2) rejected the opinions of treating sources Siqing Li, M.D., and Brenda Hopley, MFT; (3) evaluated plaintiff's subjective symptom testimony; and (4) considered the lay testimony from plaintiff's Alcoholics

---

[2]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[3]   "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

Anonymous sponsor, Martha Seronko.  [Joint Stipulation ("JS") at 3.]  As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

## A.    HYPOTHETICAL TO THE VE

Plaintiff contends that the ALJ committed legal error when he posed a hypothetical to the VE that did not reflect moderate difficulties with concentration, persistence, and pace due to mental health issues, and the need to attend frequent medical appointments, which would render the hypothetical individual unable to complete a normal workweek and maintain regular attendance without interruption from illness.  [JS at 4-10.]

### 1.    Concentration, Persistence, and Pace

At step two, relying on plaintiff's testimony and the mental residual functional capacity assessments prepared by the State Agency medical consultants, the ALJ determined that plaintiff had moderate difficulties with concentration, persistence, and pace, and in social functioning due to her mental health issues.  [AR at 21, 25, 75-76, 90-91.]  He therefore found plaintiff had severe mental impairments but they did not meet or equal a Listing.  [AR at 21.]  In his hypothetical to the VE, although he did not include any specific limitations as to concentration, persistence, or pace, the ALJ included, among other things, a limitation to simple, routine, repetitive tasks.  [AR at 64.]  Plaintiff contends that a limitation to simple, routine, repetitive tasks "does not encompass difficulties in concentration, persistence, and pace."  [JS at 5.]  Plaintiff notes that when counsel, in a hypothetical to the VE, included "deficits in concentration, persistence and pace, defined by Plaintiff's counsel as being 'off-task' 20% of the workday," the VE testified that there would be no work that plaintiff could perform.  [JS at 5-6 (citing AR at 66).]  Plaintiff argues that the VE's response demonstrates that "deficits in concentration, persistence and pace are mental limitations separate and apart from limitations relating to a person's mental ability to perform simple, routine tasks as the [VE] came to a different conclusion than the ALJ when concentration deficits were added to the hypothetical."  [Id.]

/

1    Defendant argues that the ALJ based his determination in part on the opinion of the State

2    Agency reviewing physician that plaintiff had moderate difficulties in concentration, persistence

3    and pace.  [JS at 10-11 (citing AR at 21, 76).]  In "explaining" plaintiff's "sustained concentration

4    and persistence limitations," the reviewing consultants wrote "npsrts" (non-public, simple, repetitive

5    tasks), and concluded that plaintiff could perform unskilled, nonpublic work.  [AR at 79, 81, 95.]

6    The ALJ gave these opinions "great weight" for his step two determination that plaintiff had a

7    severe mental impairment.  [AR at 21.]

8    Where the medical testimony does not establish any specific *restrictions* based on a

9    claimant's difficulty with concentration, persistence, or pace, or social functioning, the ALJ does

10   not err in adopting a physician's limitation to simple tasks.  See Stubbs-Danielson v. Astrue, 539

11   F.3d 1169, 1173 (9th Cir. 2008) (physician identified claimant as having "slow pace, both in

12   thinking & actions," but found she was still able to "carry-out simple tasks").  In Stubbs-Danielson,

13   the ALJ "translated" the physician's conclusions regarding pace and mental limitations into a

14   restriction to "simple tasks," and the Ninth Circuit found that the ALJ's assessment of the

15   claimant's concentration, persistence, or pace adequately incorporated the claimant's restrictions.

16   Id.; see also Lee v. Colvin, 80 F. Supp. 3d 1137, 1151 (D. Or. 2015) (noting that the medical

17   evidence in Stubbs-Danielson did not establish any specific *restrictions* based on difficulty with

18   concentration, persistence, or pace).

19   Here, the ALJ gave great weight to the State Agency reviewing consultants who opined that

20   plaintiff had moderate difficulties in concentration, persistence, and pace, and also concluded that

21   she was capable of performing non-public, simple, repetitive tasks.  [AR at 22, 81, 96.]  However,

22   for the reasons discussed below, the ALJ failed to properly consider the opinions of plaintiff's

23   treating sources, Dr. Li and Ms. Hopley, who found more severe mental health limitations.

24   Accordingly, on remand, the ALJ shall reassess plaintiff's RFC in light of her mental health

25   limitations, including, if warranted, any limitations in concentration, persistence, or pace and social

26   functioning.  The ALJ on remand shall provide complete and accurate hypotheticals to the VE, if

27   such testimony is warranted, based on the RFC determination.

28   /

### 2.      Monthly Appointments

Plaintiff also contends the ALJ's hypothetical did not take account of plaintiff's frequent medical appointments.  [JS at 7.]  Specifically, plaintiff contends that the record demonstrates that she attends 5-7 medical appointments per month since her alleged onset date, and on average spends about 12 hours a week at medical appointments.  [JS at 7-8.]  Plaintiff's counsel prepared a chart of plaintiff's medical visits between January 2, 2009, and April 1, 2013, and submitted that chart to the Appeals Council.  [JS at 8 (citing AR at 229-40).]  When questioned by plaintiff's counsel whether there would be work for the hypothetical individual if she were to miss more than three days of work per month due to doctor appointments or symptoms, the VE responded that there would be no work in the national economy such an individual could perform.  [AR at 67.]

Because the matter is being remanded for other reasons, on remand the ALJ shall also consider this information.


### B.      MEDICAL OPINIONS

#### 1.      Legal Standard

"There are three types of medical opinions in social security cases:  those from treating physicians, examining physicians, and non-examining physicians."  Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Lester, 81 F.3d at 830; Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician."  Lester, 81 F.3d at 830; Ryan, 528 F.3d at 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons."  Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).  "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate

1   reasons that are supported by substantial evidence in the record." Carmickle, 533 F.3d at 1164

2   (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763

3   F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012.  The ALJ can meet the requisite

4   specific and legitimate standard "by setting out a detailed and thorough summary of the facts and

5   conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157

6   F.3d at 725.  The ALJ "must set forth his own interpretations and explain why they, rather than the

7   [treating or examining] doctors', are correct."  Id.

8

9          **2.      Dr. Li**

10         On March 30, 2013, Dr. Li, plaintiff's treating psychiatrist since December 2005 [AR at

11   1813], completed a "Psychiatrist's . . . Assessment of Mental Impairment."  [AR at 1813-21.]  Dr.

12   Li noted plaintiff's diagnoses of bipolar syndrome, an eating disorder, and obsessive-compulsive

13   disorder. [AR at 1821.] He stated plaintiff's bipolar syndrome was "chronic" [id.] and her prognosis

14   was "poor." [AR at 1815.] Dr. Li assessed plaintiff as "markedly limited" in her ability to remember

15   locations and work-like procedures; ability to understand and remember detailed instructions;

16   ability to maintain attention and concentration for extended periods; ability to perform activities

17   within a schedule, maintain regular attendance, and be punctual within customary tolerances;

18   ability to sustain an ordinary routine without special supervision; ability to work in coordination with,

19   or proximity to others without being distracted by them; ability to complete a normal workday and

20   workweek without interruptions from psychologically-based symptoms, and to perform at a

21   consistent pace without an unreasonable number and length of rest periods; ability to interact

22   appropriately with the public; ability to accept instructions and respond appropriately to criticism

23   from supervisors; ability to maintain socially appropriate behavior and to adhere to basic standards

24   of neatness and cleanliness; ability to respond appropriately to changes in the work setting; ability

25   to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar

26   places or use public transportation; and ability to set realistic goals or make plans independently

27   of others. [AR at 1815-18.] In a written narrative, Dr. Li reported plaintiff had multiple psychiatric

28   hospitalizations, and had been tried on "many psychiatric medications but her response to

1   treatment is poor."   [AR at 1821.]   He noted her labile mood, depression, anxiety, poor

2   concentration, and fatigue, and stated that her physical impairments -- such as hypothyroidism,

3   hypertension, and back pain -- "greatly complicate[] her mental illness." [Id.] He further stated that

4   her judgment is "significantly impaired," she is unable to make decisions for herself, she has poor

5   memory, and she "easily becomes stressed out when she is presented with simple challenges in

6   her daily living activities."   [Id.]   He opined that "due to her chronic and persistent mental health

7   condition," plaintiff does not have the "cognitive and social skills to function" in work settings.  [Id.]

8          At step two, the ALJ found plaintiff had mild restrictions in activities of daily living, and

9   moderate difficulties in social functioning, and concentration, persistence, or pace.  [AR at 21.]

10  In determining the severity of plaintiff's mental impairments at step two, the ALJ gave "great weight

11  to the assessments of the State Agency medical consultants [dated April 19, 2012, and November

12  29, 2012], as they are consistent with the longitudinal record and with each other." [AR at 21

13  (citing AR at 75-76, 90-91).]  As noted by the ALJ, the State Agency medical consultants found

14  that plaintiff "remains able to perform the range of medium work and non-public simple, repetitive

15  tasks as described . . . in Finding #5 [of the ALJ's decision]." [AR at 25 (citing AR at 24, 77-80).]

16         In determining plaintiff's RFC (Finding #5), the ALJ stated only the following regarding

17  plaintiff's mental health symptoms:

18         In terms of [plaintiff's] alleged mental symptoms, since the alleged onset date, she
           has been hospitalized on a number of occasions including in February 2009,
19         February 2010, March 2010, May 2010, and August 2012.  However, all but one of
           these admissions were on voluntary bases for polysubstance dependence.  On
20         discharge from her August 2012 hospitalization, her Global Assessment of
           Functioning (GAF) score was 51, which as presented and described in the
21         *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) indicated moderate
           symptoms, or any moderate difficulty in social, occupational or school functioning.
22         I have not given this factor much weight. . . .

23         Accordingly, the restriction to limited to simple, routine, repetitive tasks with no
           public contact more than adequately conforms to the limitations posed by [plaintiff's]
24         mental symptoms.

25  [AR at 23-24 (citations omitted).]

26         The ALJ gave "little weight" to Dr. Li's opinion that plaintiff "is markedly limited in numerous

27  areas of mental functioning."  [AR at 25 (citation omitted).]  He stated that Dr. Li's opinion is not

28  supported by the doctor's own treatment notes [id. (citing AR at 1200-12, 1813-85)]; despite the

severity of the assessment and the assertion that plaintiff has had multiple psychiatric hospitalizations, there is no evidence that Dr. Li ever sought to hospitalize plaintiff; and, while Dr. Li stated that plaintiff had poor response to the many psychiatric medications she had tried, "the progress notes consistently indicate that the efficacy of [plaintiff's] medication is at least fair to good." [Id. (citing AR at 1201-12, 1813-85).] Additionally, the ALJ found it "notable" that a mental status examination conducted by Dr. Li on March 15, 2012, "was within normal limits and noted only slight distraction and depressed mood." [Id. (citing AR at 895-96).]

Plaintiff argues that Dr. Li's opinion "is accompanied by over 80 pages of chart notes" documenting plaintiff's treatment, and her reports of insomnia, anxiety, the inability to get out of bed, depression, obsessive counting, crying all the time, mania, refusal to shower or leave the home, fatigue, and suicidal ideation.[4] [JS at 21 (citing AR at 1200-12, 1822-85).] In December 2012, Dr. Li reported that the goal was to reduce plaintiff's symptoms from seven days a week to four days a week. [Id. (citing AR at 1823).] Plaintiff also observes that although the ALJ generally cited to the entirety of Dr. Li's treatment notes to support his finding that Dr. Li's opinion is not supported by his own notes, he never cited any specific notes that contradict Dr. Li's opinion and support this finding. [JS at 22.]

Defendant generally points to notes showing that plaintiff had "good cognitive functioning" [JS at 26 (citing AR at 1201-06, 1212, 1822-1983)], and to other notes that although they reflect side effects from medications "such as weight gain, and increased eye blinking or even occasional upset stomach," those side effects "are hardly disabling, and there was no evidence of any long term affects [sic]."[5] [JS at 27 (citing AR at 24, 1205, 1827, 1835, 1836, 1843, 1861, 1865, 1867, 1869, 1873-76).] However, the ALJ did not discuss plaintiff's medication side effects in his

---

[4]   In December 2012, plaintiff expressed to Dr. Li that she wished somebody would kill her. [AR at 1824.]

[5]   Defendant's assertion that plaintiff's side effects "are hardly disabling, and there was no evidence of any long term [e]ffects," is unpersuasive as not only did the ALJ not cite this as a reason to discount Dr. Li's opinion, but defendant improperly substitutes its own medical opinion over that of the treating physician. See Tackett v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir. 1999) (ALJ may not substitute his own interpretation of the medical evidence for the opinion of medical professionals).

discussion of Dr. Li's findings -- he discussed them as a reason to discredit plaintiff's credibility, and he did not discuss at all the notes allegedly finding "good cognitive functioning."  [See AR at 24.]  The Court is constrained to review only the reasoning asserted by the ALJ, and cannot consider post hoc reasoning by defendant, or even the evidence upon which the ALJ could have relied.  Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (noting that a reviewing court "is constrained to review the reasons the ALJ asserts," and finding error where the court affirmed the ALJ's decision "based on evidence that the ALJ did not discuss") (citing Pinto v. Massanari, 249 F.3d 840, 847-48 (9th Cir. 2001)); Jonker v. Astrue, 725 F. Supp. 2d 902, 911 n.7 (C.D. Cal. 2010).  The Court does not find the ALJ's "general" citation to all of Dr. Li's treating notes to meet the requisite specific and legitimate standard as he did not set out "a detailed and thorough summary of the facts and conflicting clinical evidence . . . ."  Reddick, 157 F.3d at 725.

In assessing plaintiff's credibility, the ALJ noted plaintiff's testimony that her medications cause side effects of fatigue, confusion, dry mouth, sleepiness, weight gain, dizziness, constipation, nausea, and vomiting, and stated that "[i]f the side effects are so severe . . . I would expect that she would inform her doctor, who would then cease or change them.  Notably, however, these complaints are not reflected in the progress notes . . . [which] repeatedly document that [plaintiff] denied any side effects."  [AR at 24 (citing Dr. Li's treatment notes).] Because the Court is remanding for reconsideration of Dr. Li's and, as discussed below, Ms. Hopley's opinions, it will not be considering plaintiff's claim that the ALJ erred when he discounted her testimony for this reason.  However, the Court notes that Dr. Li's treatment notes regarding the side effects of plaintiff's medications are at least tangentially related to the ALJ's finding that despite Dr. Li's statement that plaintiff had tried many psychiatric medications and had poor response to treatment, his notes "consistently indicate that the efficacy of [plaintiff's] treatment is at least fair to good."  [AR at 25.]  In fact, Dr. Li's treatment notes are replete with plaintiff's reports of a variety of side effects to her medications, in response to which Dr. Li frequently adjusted plaintiff's medications or took some other action.  [See, e.g., AR at 1826 (increase in eating), 1827 (irregular menstrual cycle; stated that she "can't remember stuff"; stopped Prozac due to fair response), 1831 (manic episode secondary to antidepressant combination; medications adjusted),

1832 (decreased energy and insomnia; medications adjusted), 1833 (bad side effects from Celexa; start Wellbutrin), 1835 (eye blinking; mood swings; stopped Trazadone, restarted Klonopin, increased Prozac), 1836 (increased heart rate, shaking, "can't sleep [secondary] to Saphris - stop" Saphris), 1843 (constipation, insomnia secondary to Prozac, stop Prozac), 1852 ("The side effects of antidepress. and mood stabilizer & antipsychotic meds. might worse[n] her physical health problems"), 1861 (discussed plaintiff's medications including Depakote, which caused weight gain; Loxapine, which caused extrapyramidal symptoms; Abilify, Zyprexa, and Seroquel, which caused weight gain; and plaintiff's addiction to the benzodiazepines, Xanax and Klonopin), 1863 (tired; agreed to try Seroquel and Topamax), 1864 (blinking might be caused by Loxapin; discussed risk of "TD" (tardive dyskenesia)), 1867 (reported clenched jaw and blinking and Dr. Li discussed risks of TD with Loxapine; decreased Loxapine due to extrapyramidal side effects and recommended stopping it), 1869 ("Loxapine slow[s] me down").] Accordingly, Dr. Li's treatment notes consistently document the *ineffectiveness* of plaintiff's psychiatric medications and provide support for his opinion that the plaintiff's *response* to her medications was poor, notwithstanding his notations in the treatment records that the *efficacy*[6] of plaintiff's medications was "fair" to "good."

Defendant also contends that "the ALJ noted that none of Dr. Li's treatment notes hint at Plaintiff's problems with the use of prescription medications." [JS at 27 (citing AR at 25).] Although the Court does not find this statement by the ALJ on the cited page (or anywhere else in the decision), the Court has nevertheless reviewed Dr. Li's treatment records and notes that Dr.

---

[6]    The ALJ appears to conflate efficacy and effectiveness. "**Efficacy** is a drug's capacity to produce an effect (such as lowering blood pressure)." Merck Manual, http://www.merckmanuals. com/home/drugs/drug-dynamics/drug-action. For example, one diuretic may eliminate much more salt and water through the urine than another and, therefore, is described as having greater efficacy. Id. "**Effectiveness** differs from efficacy in that it takes into account how well a drug works in real-world use. Often, a drug that is efficacious in clinical trials is not very effective in actual use. For example, a drug may have high efficacy in lowering blood pressure but may have low effectiveness because it causes so many side effects that people take it less often than they should or stop taking it entirely. Thus, effectiveness tends to be lower than efficacy." Id. The form used by Dr. Li permits either a "Good," "Fair," or "Poor" rating with regard to "Medication Efficacy." [See, e.g., AR at 1837.]

Li did in fact acknowledge plaintiff's misuse of prescription medications on several occasions. For instance, on July 27, 2009, Dr. Li noted that although plaintiff denied substance or alcohol use, "she has been taking Ativan, Klonopin and Xanax at the same time," and he discussed with plaintiff "her trend [sic] to overuse Benzo[diazepine]," and also noted "Hold Xanax. ↓ [decrease] dependency" [AR at 1864]; on July 30, 2009, plaintiff told Dr. Li that her new primary care physician was "not going to give [her] any controlled substances" [AR at 1862]; on August 1, 2009, Dr. Li discussed plaintiff's "Addiction of Benzodiazepine based on pt's [history] of response to Xanax and Klonopin combination" [AR at 1861]; on August 29, 2009, Dr. Li noted that plaintiff "took more Xanax than she should" [AR at 1860]; on September 23, 2009, he noted that with respect to plaintiff's use of Xanax, Klonopin, and Seroquel, she "took more meds than she should," and he discussed medication compliance with her [AR at 1858]; on October 12, 2009, he again discussed plaintiff's Xanax and Klonopin use with her [AR at 1857]; and on October 22, 2009, he noted "Tony [sic] improved her compliance. Not overuse [sic] Xanax or Klonopin." [AR at 1855; see also JS at 22 (citing these and other examples).] Thus, even if the ALJ did state that Dr. Li never "hinted" at plaintiff's "problem" with prescription medications, the evidence does not support this finding.

An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster his findings. See, e.g., Holohan v. Massanari, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others). As the Ninth Circuit recently explained, "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." Garrison, 759 F.3d at 1017 (citing Holohan, 246 F.3d at 1205); see also Scott v. Astrue, 647 F.3d 734, 739-40 (7th Cir. 2011) (citations omitted) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and that difference is borne out in [the] treatment notes. Those notes show that although [plaintiff] had improved with treatment, she nevertheless continued to frequently experience bouts of crying and feelings of paranoia. The

ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits."). Thus, "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms." Garrison, 759 F.3d at 1017 (citing Ryan, 528 F.3d at 1200-01); see also Holohan, 246 F.3d at 1205 ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

The ALJ's finding that there was no evidence Dr. Li ever sought to hospitalize plaintiff [AR at 25], is unpersuasive. As detailed by the ALJ, the medical evidence documents that plaintiff was psychiatrically hospitalized on five occasions -- four of them voluntary hospitalizations and one involuntary [AR at 23], and that she had "experienced one to two episodes of decompensation, each of extended duration." [AR at 21.] Although the ALJ only noted the hospitalizations after the alleged onset date, there is also evidence of "multiple inpatient hospitalizations" prior to that date at Las Encinas Hospital.  [See AR at 244 (February 2, 2009, Las Encinas history and evaluation noting plaintiff had "multiple inpatient hospitalizations" at that facility, the most recent in May of 2006).] Additionally, although the ALJ characterizes these hospitalizations as "for polysubstance dependence," the record reflects that the February 2009 hospitalization assessed plaintiff's "worsening depressive symptoms," and noted she presented at the chemical dependency unit for detoxification "*and* intervention for her mental health needs" [AR at 244 (emphasis added)]; on February 3, 2010, she presented for detoxification, and also because she was "feeling anxious and depressed" [AR at 272, 274]; on March 4, 2010, she sought voluntary admission because she was "feeling overwhelmed and anxious," took 60 Percocet and Soma in a period of two days, "is feeling helpless and useless," and is "having anxiety and trouble sleeping" [AR at 264]; on March 25, 2010, she was admitted to the psychiatric hospital because she overdosed on 100 Tramadol, and she also presented with constant crying, mood swings, anxiety, depression, episodes of helplessness, and trouble sleeping [AR at 281, 283]; and on August 13, 2012, she voluntarily admitted herself because she "need[s] some help . . . [and] cannot go on like this," and was

15

admitted based at least in part on her opiate dependence, but also "presenting with anxiety and panic symptoms." [AR at 1889.]  The Court thus finds that the alleged fact that Dr. Li never sought to hospitalize plaintiff is not a persuasive reason for rejecting his opinions.  In fact, the records of these multiple hospitalizations in and of themselves provide support for Dr. Li's March 2013 evaluation of plaintiff's mental health impairments.

The ALJ also contrasted Dr. Li's March 15, 2012, short-form mental status evaluation that the ALJ described as reflecting that plaintiff "was within normal limits and noted only slight distraction and distressed mood," with Dr. Li's March 30, 2013, Assessment of Mental Impairment in which he described marked limitations in several areas of mental functioning.  [AR at 25 (citing AR at 895-96, 1813-21).]  It appears that the ALJ is comparing apples to oranges -- Dr. Li's March 15, 2012, short-form mental status evaluation is akin to a "snapshot" assessment of plaintiff's condition as of March 2012 when he examined her and prepared that assessment, while his March 30, 2013, Assessment of Mental Impairment provides an overview of plaintiff's mental health condition over time.  See Rodriguez v. Colvin, 2014 WL 5305722, at *2 (C.D. Cal. Oct. 15, 2014) (holding that where plaintiff's condition was such that her symptoms would wax and wane, "the results of a single examination . . . cannot stand as substantial evidence, for they reveal only what took place on that date," and noting that "if ever there was value to the notion of relying on a longitudinal relationship -- the kind a treating physician enjoys with his patient, and one reason that opinions of treating physicians are given greater weight than opinions of consultants . . . it is with a disease that manifests itself differently over time") (citing Garrison, 759 F.3d at 1017).  Even in the March 2012 short-form mental status evaluation, however, Dr. Li noted that plaintiff's ability to understand, remember, and carry out complex instructions, maintain concentration, attention and persistence, perform activities within a schedule and maintain regular attendance, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and respond appropriately to changes in a work setting, were all "Fair," which was defined as the "individual's capacity to perform the activity is impaired, but the degree/extent of the impairment

needs to be further described."[7]  [AR at 897.]

Moreover, the opinion of a nonexamining physician may only serve as a basis to reject the opinion of a treating physician where the nonexamining physician's opinion is consistent with other independent evidence in the record.  Ryan, 528 F.3d at 1202 ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician") (internal citation and quotation marks omitted).  Here, although the ALJ states that the opinions of the State Agency consultants who assessed plaintiff's mental RFC are consistent with the longitudinal record, i.e., Dr. Li's and Ms. Hopley's treatment notes, because the ALJ failed to provide specific and legitimate reasons for discounting the opinions of Dr. Li and, as discussed below, Ms. Hopley, based in part on his flawed finding that their opinions were not supported by their treatment notes, this reason is not supported by substantial evidence.  Additionally, the nonexamining consultants did not have the benefit of reviewing all of the records of Dr. Li, including his March 30, 2013, Assessment, or of Ms. Hopley, plaintiff's therapist from October 2011.

### 3.    Plaintiff's Therapist

In March 2013, Ms. Hopley completed a medical source statement in which she noted plaintiff's diagnosis of depression, resulting in sadness, crying, labile mood, and difficulty maintaining social relationships.  [AR at 1804-12.]  She also noted that although she had never seen plaintiff "have a full-blown manic episode some symptoms are a concern."  [AR at 1805.] She expressed her "concern for emerging symptoms of mania and on-going depression that has not changed even with talk therapy and medication therapy" [AR at 1806], and observed that "since she has been off medication mania symptoms have been emerging slowly."  [AR at 1812.] Ms. Hopley, like Dr. Li, opined that due to plaintiff's mental impairments plaintiff had marked

---

[7]    The form also provided options for "Unlimited" (the mental disorder does not affect the ability to perform the activity), "Good" (the effects of the mental disorder do not significantly limit the individual from consistently and usefully performing the activity), and "Poor" (the individual cannot usefully perform or sustain the activity).  [AR at 897.]

1    impairments in her ability to maintain concentration, persistence, and pace, perform activities
2    within a schedule, work in coordination with others without distraction, interact appropriately with
3    co-workers, peers, and the general public, complete a normal workday/workweek without
4    interruption from psychologically-based symptoms, and perform at a consistent pace without an
5    unreasonable number of rest breaks.  [AR at 1807-08.]

6         The ALJ rejected Ms. Hopley's assessment because she did not start treating plaintiff until
7    "October 20, 2011, well after [plaintiff's] alleged onset date," and because "the treating records do
8    not support the severity of the assessment."  [AR at 26.]  As with Dr. Li, the ALJ did not cite any
9    specific records that contradict Ms. Hopley's opinions in support of this claim.  Defendant contends
10   that Ms. Hopley is "not an acceptable medical source" and "her opinion is not entitled to the same
11   deference as an acceptable medical source[]" and the ALJ may discount such an opinion if he
12   gives reasons germane to the witness for doing so, which he did.  [JS at 28-29.]  Plaintiff counters
13   that she had 67 sessions with Ms. Hopley between October 2011 and February 2013 [AR at 1688-
14   1727], and the records consistently reflect plaintiff's "struggle with emotional understanding of
15   conflicts, pain, anxiety, insomnia, depression, agitation, poor coping skills, tearfulness, social
16   withdrawal, impulsiveness, poor focus, and disorganization."  [JS at 31.]

17        The fact "that a medical opinion is from an 'acceptable medical source' is a factor that may
18   justify giving that opinion greater weight than an opinion from a medical source who is not an
19   'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified
20   health care professionals.'"  Soc. Sec. Ruling ("SSR")[8] 06-03p, 2006 WL 2263437.  In contrast,
21   a therapist is not generally considered to be an acceptable medical source (see 20 C.F.R. §
22   404.1513(d)(1) (including therapist as an "other" medical source)), and "only 'acceptable medical
23   sources' can [provide] medical opinions [and] only 'acceptable medical sources' can be considered
24   treating sources, whose medical opinions may be entitled to controlling weight."  See SSR 06-03p

25

26        [8]   SSRs do not have the force of law.  Nevertheless, they "constitute Social Security
27   Administration interpretations of the statute it administers and of its own regulations," and are
     given deference "unless they are plainly erroneous or inconsistent with the Act or regulations."
28   Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

(citations omitted).  Nevertheless, evidence from "other medical" sources, that is, lay evidence, can demonstrate the "severity of the individual's impairment(s) and how it affects the individual's ability to function."  Id.  The Social Security Administration has recognized that with "the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' . . . have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists."  Id.  Therefore, according to the Administration, opinions from other medical sources, "who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects."  Id.

Relevant factors when determining the weight to be given to an "other" medical source include:  how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairments; and any other factors that tend to support or refute the opinion.  Id.  Thus, "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' *may outweigh* the opinion of an 'acceptable medical source . . . .'"  Id. (emphasis added). The Court finds that such may be the case here where the ALJ concluded that the opinions of the nonexamining consulting examiners are entitled to more weight than Ms. Hopley's opinions.  This is especially true given the fact that Ms. Hopley's treatment notes reflect that she provided mental health treatment to plaintiff weekly from October 2011 through February 2013, and the reviewing consultants did not have the benefit of reviewing Dr. Li's or  Ms. Hopley's post-April 2012 or post-November 2012 treating records or their March 2013 assessments.  Indeed, Ms. Hopley's March 2013 assessment of mental impairment appears to be consistent with Dr. Li's March 2013 opinions.

### 4.    Conclusion

Based on the foregoing, the Court finds that the ALJ did not provide specific and legitimate reasons supported by substantial evidence in the record for discounting the opinions of Dr. Li and Ms. Hopley relating to plaintiff's mental health issues.  Remand is warranted on this issue.

## C.    CREDIBILITY

Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's subjective symptom testimony.  [JS at 32.]

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis."  Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Id.  at 1036 (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may reject the claimant's testimony about the severity of his symptoms "only upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so."  Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  Factors to be considered in weighing a claimant's credibility include:  (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and his conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Ghanim, 763 F.3d at 1163; 20 C.F.R. § 404.1529(c).

Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ did not find "affirmative evidence" of malingering [see generally AR at 20-26], the ALJ's reasons for rejecting a claimant's credibility must be specific, clear and convincing.  Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)); Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015).  "General findings [regarding a

claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Burrell, 775 F.3d at 1138 (quoting Lester, 81 F.3d at 834) (quotation marks omitted).  The ALJ's findings "'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" Brown-Hunter, 806 F.3d at 493 (quoting Bunnell, 947 F.2d at 345-46).  A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Bunnell, 947 F.2d at 346.  As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

Here, in discounting plaintiff's credibility, the ALJ specifically found the following:  (1) plaintiff's pain complaints were not supported by objective evidence; (2) plaintiff's reported mental impairments and limitations were not credible based on the fact that four of her five hospitalizations were voluntary hospitalizations for polysubstance dependence; (3) plaintiff's treatment history is inconsistent with her allegations, including the fact that (a) plaintiff alleges medication side effects but Dr. Li's treating records do not reflect that he adjusted her medications in response; (b) plaintiff's symptoms appear to be stable with the prescribed treatment and she "acknowledged that her medications helped and stated that facet block injections in particular helped for up to three months"; and (c) plaintiff's noncompliance with treatment suggests that her symptoms are not as disabling as alleged; (4) plaintiff's daily activities are inconsistent with her alleged degree of impairment; and (5) plaintiff's demeanor at the hearing "bore little resemblance to her allegations of disabling impairment," as she appeared able to focus and concentrate throughout the proceedings, and participated without any apparent need to take breaks. [AR at 23-25.]

Because the matter is being remanded for reconsideration of plaintiff's mental health issues, and the ALJ on remand as a result must reconsider plaintiff's RFC in light of the record evidence, on remand the ALJ must also reconsider plaintiff's credibility and provide specific, clear and convincing reasons for discounting plaintiff's subjective symptom testimony if warranted based

1   on his reconsideration of plaintiff's RFC.  See Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d

2   1090, 1103 (9th Cir. 2014)  (citation omitted) (the "ALJ must identify the testimony that was not

3   credible, and specify 'what evidence undermines the claimant's complaints.'"); Brown-Hunter, 806

4   F.3d at 493-94 (the ALJ failed to identify the testimony he found not credible and "link that

5   testimony to the particular parts of the record" supporting his non-credibility determination).

6

7   **D.     LAY WITNESS TESTIMONY OF SPONSOR**

8          Plaintiff's Alcoholics Anonymous sponsor provided a declaration that plaintiff had a history

9   of alcohol and drug abuse and was participating actively in her sobriety, but has "trouble with

10  following direction." [AR at 221.]  She noted that plaintiff's actions can be "sporadic" as she deals

11  with her depression and anxiety.  [Id.]  Plaintiff cancelled meetings "many times" with her sponsor

12  for different reasons, such as "she's not feeling well, is in pain, has not slept the night before or

13  is feeling depressed."  [Id.]  Although the sponsor gives plaintiff "assignments" to do, she "cannot

14  always count on the fact" that she will receive the completed assignments from plaintiff.  [Id.]

15  Additionally, plaintiff "does not take direction or criticism well and gets upset quite easily."  [Id.]

16         Noting that he is "also obliged to consider corroborative evidence" such as the sponsor's

17  statements, the ALJ stated that the sponsor's statements did not alter his opinion and "do not

18  establish that [plaintiff] is disabled." [AR at 26.]  The ALJ stated that because the sponsor is "not

19  medically trained to make exacting observations as to dates, frequencies, types and degrees of

20  medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms,

21  the accuracy of her statements is questionable."  [Id.]  He stated that the sponsor's statements

22  reflected her observations of plaintiff, and "may not be reflective of [plaintiff's] maximal capacities."

23  [Id.]  He also stated that "by virtue of her relationship to [plaintiff], [she] cannot be considered a

24  disinterested third party whose statements would not tend to be colored by affection for [plaintiff]

25  and a natural tendency to agree with the symptoms and limitations she alleges."  [Id.]  Finally,

26  stating that he could not "give great weight to her statements" because they are not fully consistent

27  with the medical opinions, the ALJ gave the sponsor's statements "limited weight."  [Id.]

28

An ALJ may consider lay witness testimony to determine the severity of a claimant's impairments and how the impairments affect her ability to work.  Stout v. Comm'r of Social Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006); 20 C.F.R. §§ 404.1513(d)(4), (e).  Lay witnesses include spouses, parents and other care givers, siblings, other relatives, friends, neighbors, and clergy.  20 C.F.R. § 404.1513(d)(4).  Thus, lay witness testimony by friends and family members who have the opportunity to observe a claimant on a daily basis "constitutes qualified evidence" that the ALJ must consider.  See Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th Cir. 1987); Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996) (testimony from lay witnesses, who see the plaintiff on a daily basis and are often family members, is of particular value).  The ALJ may discount the testimony of lay witnesses only for "reasons that are germane to each witness."  Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999).

In this case, the ALJ did not provide germane reasons for discounting plaintiff's sponsor's testimony.

First, as noted by plaintiff, the sponsor did not offer her declaration to show that plaintiff was disabled.  The declaration was offered to provide relevant evidence of plaintiff's sobriety and ongoing mental health problems based on her observations of plaintiff.  [JS at 46.]  The fact that the declaration did not establish disability is irrelevant.

Second, the Court is puzzled by the ALJ's finding that because the sponsor is "not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of her statements is questionable," and may not be reflective of plaintiff's "maximal capacities."  [AR at 26.]  Lay witnesses are not required to have medical training, or to provide exact details of their observations, or to describe a claimant's "maximal capacities."  That is what makes them "lay" witnesses.  Discounting the "accuracy" of every lay witness' statement for this reason would allow an ALJ to reject most such statements for this reason alone.  Here, the sponsor merely offered her observations of plaintiff's behavior in a succinct and straight-forward manner and did not represent that she was offering any sort of medical opinion.  This was not a

1   reason germane to this witness to reject her statements.

2       The ALJ also stated that the sponsor's statements were colored by her affection for plaintiff

3   and, therefore, she had a natural tendency to agree with the symptoms and limitations alleged by

4   plaintiff.  An ALJ may reject a lay witness' testimony if the ALJ finds the witness to be biased.

5   See, e.g., Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) (finding the ALJ's consideration

6   of the claimant's prior girlfriend's close relationship with the plaintiff and desire to help him as a

7   possible reason for bias was a reason germane to that witness); but see Smolen, 80 F.3d at 1289

8   (rejecting the ALJ's wholesale dismissal of testimony from family witnesses who were

9   "understandably advocates, and biased," as not a reason germane to each witness who testified);

10  see also Valentine, 574 F.3d at 694 (finding that being an interested party in the abstract was

11  insufficient to reject a spouse's testimony).  If an ALJ could reject a lay witness's testimony simply

12  because of his or her "affection" for the claimant, an ALJ could be permitted to reject the lay

13  witness statements of almost any lay witness.  This simply is not the case.  See Dodrill, 12 F.3d

14  at 919 (other sources include spouses, parents, caregivers, siblings, relatives, friends, neighbors,

15  and clergy in a position to observe symptoms and daily activities).  Indeed, the ALJ points to no

16  evidence to support his assertion that the sponsor's statement was colored in any way by the

17  sponsor's alleged affection for plaintiff.  If anything, the statement more accurately reflects the

18  sponsor's continuing frustrations with plaintiff.  This was not a reason germane to this witness for

19  discounting her statements.

20      Finally, the ALJ noted that the sponsor's statements were not supported by the medical

21  evidence.  Although defendant points to evidence showing that plaintiff has not been clean and

22  sober since July 2011 as the sponsor apparently believed [JS at 47 (citing AR at 221)], the ALJ

23  did not specifically point to any such evidence in the record to support his statement.  Moreover,

24  as discussed above, the ALJ's evaluation of the medical evidence itself warrants remand.

25  Accordingly, this reason for discounting the sponsor's statements also fails.

26  /

27  /

28

# VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. <u>McAllister v. Sullivan</u>, 888 F.2d 599, 603 (9th Cir. 1989). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1041; <u>Benecke v. Barnhart</u>, 379 F.3d 587, 595-96 (9th Cir. 2004). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. <u>See</u> <u>Benecke</u>, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, the ALJ shall reassess the entire medical record regarding plaintiff's mental health impairments and resulting limitations, including, but not limited to, any limitations as to concentration, persistence, and pace, social functioning, and ability to complete a normal workday or workweek. Second, the ALJ must explain the weight afforded to each opinion related to plaintiff's mental health impairments and limitations, including the opinions of Dr. Li and Ms. Hopley, and provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects, including a legally sufficient explanation for crediting one source's opinion over any of the others. Third, the ALJ shall reassess plaintiff's credibility and provide specific, clear and convincing reasons for discrediting her testimony, if warranted. Fourth, the ALJ shall reassess the testimony of plaintiff's sponsor and either credit her testimony as true or provide germane reasons for discounting or rejecting her testimony. Fifth, based on his reevaluation of the medical record relating to plaintiff's mental health impairments and limitations, and credibility assessment, the ALJ shall reconsider all of plaintiff's limitations in making the RFC determination. Finally, the ALJ shall determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing

1  in significant numbers in the regional and national economies that plaintiff can still perform.[9]

2

3                                          **VII.**

4                                   **CONCLUSION**

5       **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the

6  decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further

7  proceedings consistent with this Memorandum Opinion.

8       **IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the

9  Judgment herein on all parties or their counsel.

10      **This Memorandum Opinion and Order is not intended for publication, nor is it**

11  **intended to be included in or submitted to any online service such as Westlaw or Lexis.**

12

13  DATED:  April 18, 2016

14                                        _____
                                          PAUL L. ABRAMS
                                          UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[9]  Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to perform her past relevant work.